# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>ANDRES SOTO,<br><br>　　　　　　　　　　　　Defendant. | Case No.: 16cr2192-MMA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>[Doc. No. 68] |

On August 26, 2016, Defendant Andres Soto was arrested after being stopped by a California Highway Patrol ("CHP") officer while driving a semi tractor-trailer near the outskirts of Brawley, California. A search of the trailer revealed the presence of sixteen illegal aliens, including three children. A grand jury indicted Defendant on thirteen counts of alien smuggling, in violation of Title 8, United States Code, section 1324(a)(1)(A)(ii), (v)(II), and (a)(1)(B)(i). *See* Doc. No. 35. Defendant now moves to suppress all evidence obtained as a result of the traffic stop, vehicle search, and questioning by law enforcement officers. *See* Doc. No. 68. The parties first appeared before the Court to argue the merits of the motion. The Court advised the parties of its tentative ruling to grant Defendant's motion based on the apparent illegality of the traffic stop. However, the Court deferred ruling at that time, and subsequently held an evidentiary hearing during which the parties presented testimonial evidence from law

enforcement officers involved in the stop and search. After considering the parties' briefs, the oral arguments of counsel, and the documentary and testimonial evidence, the Court declines to affirm its tentative ruling. For the reasons set forth below, the Court **DENIES** Defendant's motion to suppress.

### DISCUSSION

Defendant moves to suppress all evidence obtained as a result of the traffic stop based on the violation of his Fourth Amendment rights. Defendant argues that the stop was not supported by reasonable suspicion as required by *Terry v. Ohio*, 392 U.S. 1 (1968). Defendant further asserts that even if the CHP officer had reasonable suspicion to execute a traffic stop, the Imperial County Sheriff's deputy who conducted a subsequent search of the trailer violated his Fourth Amendment rights. Defendant argues that all evidence obtained as a result of the search must be suppressed. Defendant also moves to suppress the incriminating statements he made to law enforcement officers, arguing that his pre-*Miranda* statements were made while he was "in custody," and his post-*Miranda* statements resulted from the use of an illegal two-step interrogation procedure.

*1.  The Traffic Stop*

a)  Facts

On August 26, 2016, an anonymous woman called 911 to report suspicious activity southeast of Brawley, California, on Worthington Road between Highway 111 and State Route 115. According to the transcript of the 911 call, the caller reported that "like five minutes ago," she saw "a whole bunch of people" running into the back of a "semi." *See* Def. Ex. A at 1. The caller stated that "a bunch of illegals" were running into the back of a trailer and "there were at least 30 people." *Id.* She further described the vehicle as being a "red semi with a white trailer in between the hay stacks." *Id.* When asked by the operator whether the trailer was a field workers' trailer, the caller stated that it was a "semi-trailer" that was parked (not moving) on Worthington between the 111 and 115, "more on the 115 side than the 111 side." *Id.* When asked by the operator "how long

ago did this happen," the caller said "like five minutes ago," and stated that she had tried calling Border Patrol first, but was transferred to voice mail. *Id*. at 2. The operator then asked whether the caller "happen[ed] to get the license plate" and the caller said she did not see the license plate because she "passed by so fast" and "kept going." *Id.* The caller also reported seeing "another car" that "looked kind of like a Bronco," that she thought was "navy blue like a dark color." *Id.* The caller declined to provide a name other than "Castro" at the end of the conversation, stating that she did not "want it to come out in the paper." *Id.* at 3.

CHP Officer Davila responded to the call. He later described the events leading up to the traffic stop in a written report, as follows:

> On Friday, August 26, 2016, at approximately 1636 hours, CHP dispatch advised of a 911 call of a big rig (s/v) loading people into the rear of the box trailer at SR-115 and Worthington Rd. Dispatch advised the truck tractor was red in color with a box type trailer. I responded from Dogwood Rd and Malan St in the Brawley area. At approximately 1645 hours, I was traveling eastbound on SR-78, approaching my location. After the s/v passed by me, I made a u-turn and proceeded to overtake it. I overtook the s/v as it came to the SR-78 intersection with SR-111, where it was stopping for a red light. The s/v proceeded to make a right turn onto northbound SR-111, where it immediately pulled over on to the dirt shoulder on its own. I advised dispatch and pulled onto the shoulder behind the s/v. The s/v then proceeded to slowly accelerate and move forward. I activated my forward red light and the s/v stopped.

Def. Ex. B.

        b)    <u>Analysis</u>

Based on the information known to Officer Davila at the time he conducted the stop, Defendant argues that the stop was not supported by reasonable suspicion.

Under *Terry* and its progeny, an investigatory traffic stop "is permissible under the Fourth Amendment if supported by reasonable suspicion." *Ornelas v. United States*, 517 U.S. 690, 693 (1996). To find that reasonable suspicion existed to justify a stop, a court must examine the "totality of the circumstances" of the situation at hand, in light of the

officer's own training and experience, and should uphold the stop only if it finds that "the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  An "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion into the privacy of the detained individual.  *Terry*, 392 U.S. at 21.  When considering the totality of the circumstances, courts must keep in mind that reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Ornelas*, 517 U.S. at 695 (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

Defendant argues that the information provided by the 911 caller was insufficient to establish reasonable suspicion of criminal activity.  "Courts will uphold an investigatory stop based on a tip or other secondary information only when the information possesses sufficient indicia of reliability that are independently corroborated by the police."  *United States v. Thomas*, 211 F.3d 1186, 1190 (9th Cir. 2000) (citing *Florida v. J.L.*, 529 U.S. 266 (2000) (holding stop invalid where anonymous tip "provided no predictive information and therefore left the police without means to test the informant's knowledge and credibility")).

The government contends that the anonymous tip in this case satisfies the indicia of reliability set forth in *Navarette v. California*, 134 S. Ct. 1683 (2014).  The caller was an eyewitness to the events she described, and she used the 911 system. *Id*. at 1689-90 (noting that the caller used the 911 system, increasing the tip's veracity by "provid[ing] some safeguards against making false reports with immunity."); *see also United States v. Terry-Crespo*, 356 F.3d 1170, 1172 (9th Cir. 2004) ("911 call[s] [are] entitled to greater reliability than a tip concerning general criminality because the police must be able to take seriously, and respond promptly to, emergency 911 calls.").  The caller also provided a factual basis for suspecting that the individuals involved were engaged in

criminal activity at the time of the 911 call. *Navarette*, 134 S.Ct. at 1690. This is because, regardless of whether the caller had actual knowledge of the individuals' immigration status, California Vehicle Code Section 21712 makes it illegal for passengers to ride in vehicles or parts of vehicles that are not intended for passengers.

However, important factual details distinguish this case significantly from *Navarette*. In *Navarette*, the dispatcher relayed a tip from a 911 caller, recorded as follows: "'Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8-David-94925. Ran the reporting party off the roadway and was last seen approximately five [minutes] ago.'" *Navarette*, 134 S. Ct. at 1686-1687. The caller identified the make and model of the vehicle, in addition to the color and the license plate number, and reported that the vehicle was traveling southbound on a particular road at a particular time. *Id.* at 1689 ("By reporting that she had been run off the road by a specific vehicle—a silver Ford F-150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability."). The 911 call was considered "contemporaneous," because police pulled the vehicle over on that same road, traveling southbound, 18 minutes after the 911 call, 19 miles south of the vehicle's location at the time of the 911 call. *Id.* However, even with this degree of detail, the Supreme Court declared it to be a "close case." *Id.* at 1692.

Here, it is an even closer case. The caller provided only a static location and a generic description of the suspect vehicle. The caller did not see the license plate, did not interact directly with the vehicle, passed it quickly, and indicated that the vehicle was parked in between hay stacks at the time, at a location anywhere from 12 to 15 miles away from where the CHP officer ultimately stopped the vehicle. The caller's description of the vehicle was limited to general type and color. The 911 call was short on detail, and by the caller's own admission, was not contemporaneous with her observation of the criminal activity.

Without something more, the implication is that Officer Davila had reasonable suspicion that afternoon to stop any red semi tractor-trailer within an approximate thirty mile radius. However, the Fourth Amendment requires not only an "objective" basis "for suspecting the particular person stopped of criminal activity," but also a "particularized" basis. *Navarette*, 134 S. Ct. at 1687. Under these circumstances, the tip alone did not provide reasonable suspicion to stop Defendant's vehicle. Therefore, police corroboration of criminal activity was necessary. *See Navarette*, 134 S. Ct. at 1691; *see also United States v. Edwards*, 761 F.3d 977, 984 (9th Cir. 2014) (describing the fourth *Navarette* factor).

"In order to determine if reasonable suspicion existed to justify an investigatory stop, the court must consider the facts available to the officer *at the moment of seizure*." *United States v. Smith*, 217 F.3d 746, 749 (9th Cir. 2000) (citing *Terry*, 392 U.S. at 21-22) (emphasis added). The question is whether, absent the 911 call, Officer Davila had reason to suspect criminal wrongdoing at the time he "seized" Defendant. To make this determination in light of the particular facts of this case, it is important to identify the exact point at which Officer Davila seized Defendant. The Ninth Circuit has explained that "a seizure occurs when an officer, through some form of physical force or show of authority, restrains the liberty of a citizen." *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001) (citations omitted).

Officer Davila testified consistently with his written report that he executed a U-turn and maneuvered his vehicle into position behind the tractor-trailer while stopped at a red light. The tractor-trailer turned right, and immediately pulled over onto the shoulder. Officer Davila testified that when he pulled over and parked behind the tractor-trailer on the side of the road, he considered it a "welfare check" and had not yet activated his lights. Rather, he began exiting his vehicle and only activated his lights once the tractor-trailer began to accelerate forward.

Officer Davila effectively detained Defendant when he activated his forward red lights. At that point, Officer Davila asserted his authority as a law enforcement officer,

such that any reasonable person in Defendant's position would have known that he was no longer free to drive away.  *See Florida v. Royer*, 460 U.S. 491, 501-02 (1983) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)).  As such, the reasonable suspicion determination includes facts available to Officer Davila after he parked his vehicle on the shoulder behind the tractor-trailer, up through the time that he activated his lights.

The parties addressed the exact timeline of events during the evidentiary hearing.[1] Officer Davila testified on direct as follows:

> As he had pulled over originally on his own before I activated my lights, I stopped for doing a welfare check, and as I was opening my door, I heard that the "reefer" was on, and at that point, I noticed that the refrigerator was on but there was no seal or lock on the trailer in the back. So that was the time when he was about to take off, so I went ahead and activated my light. . .

*Transcript* at 9:15-21.  During cross examination, Officer Davila further explained his observations leading up to, and at the moment he activated his lights:

> Q. So you activated, according to your report, you activated your red lights first, and then you exited the vehicle, and then you noticed that the refrigeration unit was on?
>
> A. Yes, it was at about the same time as I was – it happened really fast. It was instant, kind of like pulling over, because he had pulled over to the shoulder. Before I activated the lights, he had pulled over. So I pulled in behind him, and it was about the same time that I was about to exit. My door was open, of course, when I activated my light. Open the door, you can hear, obviously, hear the refrigerator because it was very loud, and he was about to start taking off, and that's when I activated my light.

*Id.* at 21:9-20.  On redirect, Officer Davila confirmed the instantaneous nature of events:

> Q. You were just testifying about the sequence of events as you pulled up behind the tractor-trailer in your report that was handed to you. You said it

---

[1] The Court acknowledges that the limited purpose of the evidentiary hearing was to address disputed facts related to the search of the trailer.  However, testimony elicited from Officer Davila by counsel for both parties is material to the reasonable suspicion analysis, and as such, cannot be disregarded.

was very brief. When you pulled up behind the tractor-trailer, were your lights on initially?

A. No.

Q. Did you then step out of the vehicle, or what was your next step after you pulled up behind it?

A. I was about to step out. I just opened my driver side door. I opened it up, and that's when I observed the vehicle starting to move forward like it was about to take off again, get back and going on the road, and that's when I activated my lights.

Q. As you opened the door, did you hear anything –

A. Yes, I heard the –

Q. – from the vehicle?

A. – I heard the refrigeration unit was on.

Q. Was that before or after you activated your lights?

A. It could have been right before. It could be right at the time I was activating the light. It just happened really fast. I pulled up, I opened the door, and that's when I observed that he was about to start moving, and of course, I heard the refrigeration, and I hit my lights. It all happened kind of simultaneously almost.

*Id.* at 23:3-24:1.

The Court finds Officer Davila's testimony credible. As such, the Court concludes that the facts available to Officer Davila at the time he activated his lights included the vehicle's movement, the working refrigeration unit on the trailer, and the lack of a seal or lock on the trailer's back doors. As Officer Davila noted in his written report, "trailers with the refrigerator on are commonly carrying some type of produce, and therefore are usually locked with some type of seal." Def. Ex. B. These facts, combined with the information provided by the 911 caller, Officer Davila's eighteen years as a CHP officer,

his specialized commercial inspection experience, his knowledge of the area, and his daily duties focusing on the enforcement of California's vehicle code with respect to commercial traffic, including tractor-trailers, gave rise to a reasonable suspicion of criminal activity. *See Ornelas*, 517 U.S. at 700 ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists."). The traffic stop was lawful.

### 2. *The Vehicle Search*

#### a) Facts[2]

While Officer Davila spoke to Defendant from the passenger side of the tractor-trailer, Imperial County Sheriff's Deputy Randy McCoy arrived with another deputy after being dispatched to respond to the anonymous 911 call. Deputy McCoy credibly testified regarding the following events.

Upon arrival at the scene, Deputy McCoy exited his marked vehicle at the rear of the tractor-trailer and observed the back of the trailer. McCoy noticed that the trailer doors were neither sealed nor padlocked, and there were numerous different types of shoeprints on the foot rail on the back of the trailer. Deputy McCoy also noticed that the trailer's refrigeration unit was on, which in his experience, normally indicates that the trailer is carrying a load. McCoy testified that based on his training, and multiple different shoeprints on the foot rail were inconsistent with the manner in which a trailer is normally loaded, and the unsealed doors were inconsistent with a loaded trailer.

After making these observations, Deputy McCoy asked Officer Davila if he could speak with Defendant. Officer Davila agreed, and Deputy McCoy proceeded to introduce himself and advise Defendant regarding the report of people in the trailer. Defendant

---

[2] Border Patrol Agent Juan Heras indicated in his written report of the incident that "Officer Davila stated he performed a visual inspection from the small window on the back door of the cargo box, and observed what could possibly be humans hiding under grey wrapping paper." Def. Ex. C. However, based on the credible testimony provided during the evidentiary hearing by Officer Davila and Imperial County Sheriff's Deputy Randy McCoy, the Court finds that Agent Heras' written report is inaccurate on this particular detail, and that Deputy McCoy actually performed the visual inspection at issue.

indicated that he was not aware of any people in the trailer. Defendant also claimed that he was hauling spinach. Deputy McCoy asked Defendant for permission to look into the trailer using the vent door, so as not to disturb his load. According to Deputy McCoy, Defendant consented to the visible inspection of the inside of the trailer using the vent door. Deputy McCoy opened the vent door on the back of the trailer, looked inside, and noticed that there were empty pallets and no spinach. Deputy McCoy also noticed what appeared to be people's silhouettes. At that time, he notified his dispatch and advised that Border Patrol needed to respond to the scene. Deputy McCoy opened the vent door a second time in the presence of his fellow deputy and Officer Davila, using a flashlight to show them the silhouettes. Deputy McCoy then advised Defendant that he was not under arrest, but he was being detained until Border Patrol agents arrived to speak with him.

      b)     <u>Analysis</u>

          *i. Standing*

As an initial matter, the government argues that Defendant lacks standing to contest the search of the vehicle because he did not own the tractor-trailer, and he only occupied the vehicle for a short period of time to conduct business.

A defendant bears the burden of establishing, under the totality of the circumstances, that the search violated his legitimate expectation of privacy in the place searched or the things seized. *Rakas v. Illinois*, 439 U.S. 128 (1978). Because Fourth Amendment rights are personal and may not be vicariously asserted, *Rakas*, 439 U.S. at 133, as a general rule, only the owner of a vehicle or an individual with a legitimate privacy interest in a vehicle may challenge the legality of a search. *See United States v. Broadhurst*, 805 F.2d 849, 851-52 (9th Cir. 1986); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

The Ninth Circuit has held that a person with "permission to use" a vehicle, and "the keys to the ignition and the trunk . . . possesses the requisite legitimate expectation of privacy necessary to challenge the propriety of the search." *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980). As in *Portillo*, Defendant "had both permission to

use" the tractor-trailer and "the keys to the ignition and the trunk, with which he could exclude all others, save the owner," and as such, "possesse[d] the requisite legitimate expectation of privacy necessary to challenge the propriety of the search." *Portillo*, 633 F.2d at 1317.  Furthermore, Defendant has standing in this case because he was the "victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Rakas*, 439 U.S. at 134-35 (emphasis in original) (citations omitted).

### *ii. Legality of the Search*

The Fourth Amendment requires, as a general matter, that police procure a warrant before searching or seizing property. *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 1716 (2009).  It is undisputed that Deputy McCoy did not have a warrant to conduct a visual inspection using the trailer's vent door.  Therefore, the Court must determine whether Defendant consented to the search, or if the search was justified under an exception to the warrant requirement.

Courts must consider five factors to determine whether consent to a search was voluntarily given: "(1) whether the person was in custody; (2) whether the officers had their guns drawn; (3) whether a *Miranda* warning had been given; (4) whether the person was told that he had the right not to consent; and (5) whether the person was told that a search warrant could be obtained." *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (citation omitted).

Deputy McCoy testified during the evidentiary hearing that he asked Defendant for permission to open the vent door and visually inspect the inside of the trailer.  According to McCoy, Defendant responded twice in the affirmative, thereby consenting to the search.  On cross examination, Deputy McCoy stated that he did not provide Defendant with *Miranda* warnings, nor did he advise Defendant regarding his right to withhold consent and request that the officers obtain a warrant.  The Court concludes that while Defendant was not "in custody" at the time of Deputy McCoy's request to search, and the

officers' guns were not drawn, the three remaining factors under *Reid* weigh against finding that Defendant's consent was voluntary.

Irrespective of the consensual nature of the search, the government argues that the search was valid under the administrative search exception to the warrant requirement. In *United States v. Delgado*, 545 F.3d 1195 (9th Cir. 2008), the Ninth Circuit joined other circuits in holding that commercial trucking is "a pervasively regulated industry under *New York v. Burger*, 482 U.S. 691 (1987)," and therefore subject to warrantless inspections. In so holding, the circuit court noted that "[c]ommercial trucking is subject to extensive federal regulation. Numerous states also impose substantial regulatory and inspection standards for commercial vehicles." *Delgado*, 545 F.3d at 1201 (citing, *inter alia*, Cal. Vehicle Code § 2813).

In *Burger*, the Supreme Court held that a warrantless search is nevertheless reasonable if three conditions are satisfied: 1) the underlying regulatory scheme advances a substantial government interest; 2) warrantless inspections are necessary to further the regulatory scheme; and 3) the inspection program provides a "constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702-03. California's "regulatory scheme," as identified by the *Delgado* court, is set forth in the Vehicle Code and provides as follows:

> Every driver of a commercial vehicle shall stop and submit the vehicle to an inspection of the size, weight, equipment, and smoke emissions of the vehicle at any location where members of the California Highway Patrol are conducting tests and inspections of commercial vehicles and when signs are displayed requiring the stop. Every driver who fails or refuses to stop and submit the vehicle to an inspection when signs are displayed requiring that stop is guilty of a misdemeanor.

Cal. Veh. Code § 2813. The traffic stop in this case does not fall within the purview of the California statute, as the stop did not occur because the CHP was conducting inspections of commercial vehicles, nor was there signage requiring all commercial

1  vehicles to stop at that location.  As such, the administrative search exception to the
2  Fourth Amendment's warrant requirement does not apply in this case.
3        The government next argues that the search was valid under the "automobile
4  exception" to the search warrant requirement.  Under the "automobile exception,"
5  "[o]fficers who have probable cause to believe that an automobile contains evidence of a
6  crime may search the vehicle, including the trunk and all containers in which there is
7  probable cause to believe that evidence was concealed." *United States v. Alvarez*, 899
8  F.2d 833, 839 (9th Cir. 1990).  "The experience of a trained law enforcement agent is
9  entitled to consideration in determining whether there was probable cause." *United*
10 *States v. Arrellano-Rios*, 799 F.2d 520, 523 (9th Cir. 1986).
11       Here, Deputy McCoy had probable cause to conduct a visual inspection of the
12 interior of the trailer.  Deputy McCoy's search was based on his observations of the rear
13 of the trailer, including the multiple shoeprints on the foot rail, the unsealed doors, the
14 operating refrigeration unit, Defendant's indication that he was transporting spinach, and
15 McCoy's sixteen years of law enforcement experience.  Based on his training,
16 observations, interaction with Defendant, and knowledge of the information provided
17 from the 911 call, Deputy McCoy had probable cause to visually inspect the interior of
18 the trailer using the vent door.  The search was lawful.

19     **3.**    ***Defendant's Statements***
20         a)    <u>Facts</u>
21 Border Patrol Agents Juan Heras and Christian Garcia responded to the scene.  As
22 Agent Heras was performing an exterior canine sniff of the trailer with his canine partner
23 Ria, Agent Garcia questioned Defendant regarding the trailer's contents.  Defendant
24 made a number of incriminating statements while being questioned.  According to Agent
25 Garcia, when he asked Defendant "what he was hauling in the trailer," Defendant
26 hesitated and then stated "there is people inside." Def. Ex. C at 2.
27       Following Defendant's arrest for suspected alien smuggling, Defendant and the
28 illegal aliens were transported to the Calexico Border Patrol Station for processing and

1  questioning. Defendant was read his rights, elected to waive them, and proceeded to
2  provide an incriminating statement to the agents.

3         b)     <u>Analysis</u>

4             *i. Pre*-Miranda *Statements*

5  Defendant argues that he "was in custody the moment Officer Davila asked [him]
6  to exit the vehicle." *Def. Reply* at 6. As such, Defendant asserts that his statements must
7  be suppressed because none of the law enforcement officers at the scene provided him
8  with *Miranda* warnings prior to questioning him.

9  "Officers are required to inform suspects of their Fifth Amendment rights before
10 custodial interrogations." *United States v. Basher*, 629 F.3d 1161, 1166 (9th Cir. 2011)
11 (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)). "Two discrete inquiries are
12 essential to the ["in custody"] determination: first, what were the circumstances
13 surrounding the interrogation; and second, given those circumstances, would a reasonable
14 person have felt he or she was not at liberty to terminate the interrogation and leave."
15 *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Ninth Circuit has further specified
16 that "a court must, after examining all of the circumstances surrounding the interrogation,
17 decide 'whether there [was] a formal arrest or restraint on freedom of movement of the
18 degree associated with a formal arrest.'" *United States v. Kim*, 292 F.3d 969, 973 (9th
19 Cir. 2002) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

20 A defendant subject to a *Terry* stop is not "in custody," and whether *Miranda*
21 warnings were given is "inapposite." *United States v. Basher*, 629 F.3d 1161, 1168 (9th
22 Cir. 2011). There is no "litmus-paper test" for "determining when a seizure exceeds the
23 bounds of an investigative stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983); *Eberle v.
24 City of Anaheim*, 901 F.2d 814, 819 (9th Cir. 1990). Instead, the court must examine the
25 "totality of the circumstances" in deciding "whether an investigative detention has
26 ripened into an arrest." *Eberle*, 901 F.2d at 819.

27 Defendant points to the number of uniformed, armed law enforcement officers at
28 the scene, as well as his location on the side of the road, to support a finding that he was

"in custody" at the time Agent Garcia questioned him. However, Defendant does not claim that any of the officers drew their weapons, and the questioning took place in public. *See Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) ("Perhaps most importantly, the typical traffic stop is public, at least to some degree."). Defendant argues that he did not feel free to leave, and defense counsel solicited testimony from Deputy McCoy that he would not have allowed Defendant to "walk away." *Transcript* at 44:23-24. But these factors are not determinative, as the Court's "inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." *Kim*, 292 F.3d at 973. Furthermore, Deputy McCoy testified that he specifically advised Defendant that he was not under arrest. Defendant also notes that he began to pace, and one of the Border Patrol agents told him "not to leave." *Def. Decl*. ¶ 7. However, "[a] valid stop does not become an arrest merely because law enforcement agents momentarily restrict a person's freedom of movement." *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir. 1986).

In sum, although the officers visibly carried weapons, they did not draw their weapons. There was no use of physical force, and it does not appear there was any threatening language. Defendant's movements were not significantly curtailed and the events occurred in public. Defendant was detained while Agent Garcia questioned him, but he was not yet "in custody." *Miranda* warnings were not required.

### ii. Post-Miranda *Statements*

Defendant argues that his post-*Miranda* statements must be suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004), because warnings were withheld until after he had already made incriminating statements in the field.

A defendant's post-*Miranda* statement may be inadmissible if law enforcement officers use a two-step interrogation process. *See id.* A two-step interrogation involves eliciting an unwarned confession, administering the *Miranda* warnings, obtaining a waiver of rights, and then eliciting a repeated confession. *See id.* at 609-10. As discussed above, Defendant was not "in custody" when questioned during the traffic stop.

1  Therefore, an impermissible two-step interrogation did not occur. *See id.* at 600.
2  Moreover, the evidence supports a finding that Defendant's post-*Miranda* statements
3  were voluntarily made. Defendant knowingly waived his rights, and there is no
4  indication that Defendant was coerced either by physical intimidation or psychological
5  pressure. Defendant's post-*Miranda* statements are not subject to suppression.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant's motion to suppress.

**IT IS SO ORDERED**.

DATE: February 21, 2017

_____
HON. MICHAEL M. ANELLO
United States District Judge